**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. GJH-19-027** |
| | * | |
| **BURUDI JARADE FAISON,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO
## CERTAIN OF DEFENDANT'S PRETRIAL MOTIONS

The United States of America, by and through its undersigned counsel, hereby

respectfully opposes defendant Burudi Faison's ("Defendant's") motion to suppress evidence,

(ECF No. 22), and motion for a *Franks* hearing, (ECF Nos. 19, 23) (collectively, the "Pretrial

Motions").[1]  For the reasons set forth below, the Pretrial Motions should be denied.

## BACKGROUND

As outlined in the affidavit in support of the federal criminal complaint and arrest warrant

against Defendant in this case, and state-court materials, on September 5, 2018, a driver

("Individual 1"), who was accompanied by a passenger ("Individual 2"), flagged down two on-

duty Prince George's County (Maryland) Police Department ("PGPD") officers in connection

with a road rage incident in Capitol Heights, Maryland.  (ECF No. 1-1, at 3, para. 5; *see* ECF No.

19-1, at 11 (Statement of Probable Cause).)  Individual 1 told the officers, Corporal Baird and

Police Officer McIntosh, that he had just been involved in that incident with two male occupants

---

[1]      Defendant filed his original *Franks* motion at ECF No. 19, and re-filed an identical
motion (appearing to differ only in the date) at ECF No. 23.  The government will respond to
both motions with reference to the subsequently-filed motion, ECF No. 23.  Because the exhibits
differed in terms of particular pages included, however, the government refers to the exhibits, as
applicable, by their specific numbers, *e.g.*, ECF No. 19-1.

of a black Toyota Tundra.  (ECF No. 1-1, at 3, para. 5; ECF No. 19-1, at 11.)  Individual 1

further informed the officers that after he followed the black Toyota Tundra to a house on

Farmingdale Avenue (later identified as at a specific address on Farmingdale Avenue, Capitol

Heights, Maryland, 20743 (the "Farmingdale Avenue house")), the Tundra's occupants exited

the vehicle and that upon a brief verbal altercation, one of those occupants—later identified as

Defendant—threatened to shoot Individual 1.  (*See* ECF No. 1-1, at 3, para. 5; ECF No. 19-1, at

11.)  Fearing for his life, Individual 1 sped away from the Farmingdale Avenue house and

flagged officers down, who happened to be at a nearby location.  (*See* ECF No. 1-1, at 3, para. 5;

ECF No. 19-1, at 11.)

Officers Baird and McIntosh then immediately drove in the direction Individual 1 advised

he had last seen the vehicle, towards the Farmingdale Avenue house.  (ECF No. 1-1, at 3, para. 5;

ECF No. 19-1, at 11).  At the officers' request, Individual 1 and Individual 2 stayed where they

were, and both Individual 1 and Individual 2 submitted sworn written statements detailing the

events, including descriptions of the black Toyota Tundra and its occupants, to PGPD Officer

Stokes, who soon arrived on the scene.  (*See* Exs. A (Sworn Statement of Individual 1), B

(Sworn Statement of Individual 2), and D (Officer Stokes's Body Camera Recording).)  The

sworn written statements, the writing of which was recorded on Officer Stokes's body camera,

included commemorating the fact that Defendant threatened to shoot Individual 1, as discussed

herein.  (Because of the manner in which they were flagged down, neither Officer McIntosh's

nor Corporal Baird's body cameras were activated at the time of their original interactions with

Individual 1 and Individual 2.)

Specifically, Individual 1 detailed in his written statement that the other driver "cut

[Individual 1] off" and Individual 1 "was trying to catch up to the drive[r] and ask him why he

was driving like that and why [he] cut [Individual 1] off." (Ex. A, at 1.) Individual 1 stated that they "proceed[ed] to Farmingdale Ave[.] w[h]ere the two guys jumped out and told me they was going sho[o]t me. I then got back in my car and pulled off. I then turned to see two police officers and told them my statement." (*Id.*)

Individual 1 added: "Also before I got to the house the driver was jumping out [of] his car and running in the house when the passenger processed [sic] saying ['] why you leaving[,] we got you now.'" (*Id.* at 2.) Individual 1 confirmed: "[T]he passenger was the one saying he would shoot me." (*Id.*) Individual 1 provided a brief physical description of the passenger and driver, and added: "[B]ut they both got [out] of a black [T]oyota [T]undera [sic] pick up truck that is four doors." (*Id.*) In response to specific follow-up questions from Officer Stokes, Individual 1 reflected that both men had run into the house from the truck, included a brief description of the house (as having brick steps and being up stairs, (*id.*; *see also, e.g.*, Ex. C at 9:55:42-9:56:00), and said that he did not see a gun, (Ex. A, at 2.) Individual 1 signed the statement "as true and correct to the best of [his] knowledge," witnessed by Officer Stokes. (*Id.* at 1 (capitalization omitted), 2.)

As the body camera footage makes clear, Individual 1 was agitated when Officer Stokes approached him, recounting immediately part of the incident and a threat to shoot him before he waved the officers down. (Ex. C at 9:34:29.) Individual 1 was further upset when Officer Stokes informed him that the two individual in the other vehicle had just "got[ten] locked up with two guns," (*id.* at 9:35:28), as will be described below, and repeated the facts of the threat to shoot him, (*id.* at 9:35:48), before telling Officer Stokes that he had had the confrontation just after having dropped his daughter off at school, (*id.* at 9:35:52). Individual 1 agreed to write a statement, and stated explicitly that his "life [had been] in danger." (*Id.* at 9:35:10.)

Upon inquiry from Officer Stokes, Individual 1 said that he had not seen a gun, (*see id.* at 9:46:38), replying that the relevant occupant of the Tundra "ran," after "he threatened me with it," (*id.* at 9:46:44), and proceeded to describe the interaction in further detail, including with the statement by Defendant (the passenger) of "'what's up? I'll shoot you,'" when they got out of their vehicles, (*id.* at 9:47:07, 9:51:53.) Individual 1 confirmed having told Officers Baird and McIntosh about the threat to shoot him, (*id.* at 9:47:30), reiterated that the threat was made by the passenger, (*id.* at 9:51:50-9:52:03, 10:03:20), and confirmed—both in his sworn written statement mentioned above, (Ex. A, at 2), and during his conversation with Officer Stokes—that the vehicle in question was a black, four-door Toyota Tundra pick-up truck, (Ex. C at 9:50:55, 9:52:58-9:53:15, 9:55:37-9:55:42, 10:02:35 (Individual 1 referring again to a truck), 10:05:10; *see* ECF No. 1-1, at 3, para. 5.)[2]

Individual 2 recounted similar events in her sworn written statement: that she saw "two older men who hopped out [of] a black pick-up truck," before "one took off running to [the Farmingdale] house screaming to [her] boyfriend [Individual 1], 'I'm going shoot your ass,'" while "the other guy waited out front.'" (Ex. B, at 1.) She continued: "The other gentleman who was still out in front of [the] black pick up truck yelled to" Individual 1, "'don't run, slow the fuck down and get your ass shot." (*Id.*; Ex. C at 10:03:40 (confirming having heard the driver having yelled that he would "shoot your ass").) Individual 2 said she was scared, having just woken up, so she "leaned [her] seat all the way back." (Ex. B, at 1.) Then: "Once we got to

---

[2]     The road-rage incident and the color of the Toyota Tundra involved—as described by both Individual 1 and Individual 2—was further corroborated by real-time PGPD dispatch calls as the officers went up Farmingdale Avenue, which may be played at the hearing in this matter. (*E.g.*, Radio Recordings at 00:15 ("We got an unknown trouble on Farmingdale Avenue . . . ."), 00:20 ("There may be a 7A implied here. [W]e're gonna verify that here in a minute"), 00:35 ("We got a black Toyota Tundra, Maryland tag 4-Charlie-Lincoln-3939."). PGPD radio dispatch event code "7A" indicates a subject who is armed with a weapon.

the top of the hill there were two officers who [Individual 1] was able to tell what occurred."
(*Id.*; s*ee also* Ex. C at 9:49:00-9:50:07 (reflecting Officer Stokes's witnessing her statement),
10:03:56-10:04:11 (confirming with Individual 1 having observed what occurred and
Defendant's running into the house to, they perceived, get a gun, and then Individual 1 and
Individual 2 left and found the police).)  Individual 2 signed the statement "as true and correct to
the best of [her] knowledge."  (Ex. B, at 2.)  (Officer Stokes leaves Individual 1 and Individual 2
at 10:06.)

When Officers Baird and McIntosh began driving in the direction Individual 1 had
indicated upon the initial report, they quickly saw a black Toyota Tundra with two occupants
driving towards them on Farmingdale Avenue.  (*See* ECF No. 1-1, at 3, para. 6; ECF No. 19-1, at
11.)  Based on the information Individual 1 provided, the officers conducted an investigative stop
on the black Tundra.  (ECF No. 1-1, at 3, para. 6; ECF No. 19-1, at 11.)  Upon approaching the
passenger side of the Tundra as part of the investigative stop, Officer McIntosh noticed a large,
partially-concealed firearm hidden vertically underneath Defendant's shirt and in his waistband.
(*See* ECF No. 1-1, at 3, para. 7; ECF No. 19-1, at 11.)  The officers secured the driver and
removed the firearm, an 80% lower handmade AR-type pistol with no serial number, from
Defendant's person.  (*See* ECF No. 1-1, at 4, para. 8; ECF No. 19-1, at 11.)  The officers then
removed Defendant from the vehicle and recovered a second firearm, a loaded Kimber warrior
.45 caliber handgun, from Defendant's waistband.  (*See* ECF No. 1-1, at 4, para. 9; ECF No. 19-
1, at 11.)  A photograph of the firearms is attached hereto as Exhibit D.

The officers soon then learned that Defendant and the Tundra's driver resided together at
the Farmingdale Avenue house (which matched Individual 1's description), which the driver
owned.  (*See* ECF No. 1-1, at 4, para. 10.)  Based on these facts as received from the originating

officers, Bureau of Alcohol, Tobacco, Firearms, and Explosives Task Force Officer ("TFO") Nicole McGowen applied for a search warrant for the Farmingdale Avenue house. Prince George's County Circuit Court Judge Erik H. Nyce signed the search warrant, and it was issued that same day on the afternoon of September 5, 2018. (*See* Ex. E.) The driver gave consent to search the residence, as well. (Ex. E, at 1.)

In her affidavit in support of the search warrant, TFO McGowen described her background, training, and experience, (Ex. E, at 3), and recounted the facts as outlined above, (*id.* at 3-4), as well as additional investigative information such as pertaining to Defendant's criminal history, (*id.* at 4). She further stated her "belief that there may be .45 caliber ammunition or firearm paraphernalia within [the Farmingdale Avenue house] . . . ." (*Id.*) She expanded that she knew based on her knowledge, training, and experience that, among other things, "[i]ndividuals in possession of firearms[] keep ammunition and magazines in their possession in the event they need to use that weapon," that "[i]ndividuals prohibited from possessing firearms and ammunition typically conceal their firearms or firearms accessories inside of their home to prevent law enforcement officials from discovering the items," and that ".45 caliber ammunition is not normally sold in quantities of 8 rounds, and that individuals who possess loaded guns possess the packaging for and other rounds of ammunition in their residences or storage dwellings . . . ." (*Id.* at 5.)

Pursuant to the driver/homeowner's consent, (*see* Ex. E, at 1), and to the court-ordered search warrant, the officers searched the Farmingdale Avenue house that same day. In Defendant's bedroom, law enforcement discovered approximately 90 rounds of ammunition—including a box that was missing the exact number of .45 caliber rounds as Defendant had loaded in the firearm in his waistband—, two digital scales and suspected paraphernalia, multiple vials

of suspected PCP, and a variety of documents bearing Defendant's name—among other items. (ECF No. 1-1, at 4, paras. 10-11.)[3]

In light of the firearms and ammunition recovered and Defendant's status as a person prohibited from possessing firearms and ammunition, a Grand Jury sitting in this District charged Defendant with Possession of Firearms and Ammunition by a Convicted Felon and Possession of Ammunition by a Convicted Felon, both in violation of 18 U.S.C. § 922(g)(1) (two separate counts pertaining to the vehicle incident and search warrant findings later that day, respectively). (ECF No. 13.)

<u>**ARGUMENT**</u>

I. **DEFENDANT'S MOTION TO SUPPRESS EVIDENCE RECOVERED FROM THE INVESTIGATORY STOP OF THE BLACK TOYOTA TUNDRA IN WHICH HE WAS A PASSENGER SHOULD BE DENIED BECAUSE THE OFFICERS HAD AMPLE REASONABLE SUSPICION TO CONDUCT THE STOP.**

**A. Investigatory Stops**

With respect to "brief investigatory stops of persons or vehicles that fall short of traditional arrest," the Supreme Court has noted that "[b]ecause the 'balance between the public interest and the individual's right to personal security' . . . tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that *criminal activity* '*"may be afoot*.""" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (emphasis added). Thus, although Defendant correctly notes that investigatory, or "*Terry*," stops implicate the Fourth Amendment, (ECF No. 22, at 3), Defendant errs in asserting that for an automobile stop to be reasonable, police must have "probable cause to believe that a traffic violation has occurred," (*id.*). There is no

---

[3]    The driver, who—as previously mentioned—owns the Farmingdale Avenue house, also identified the bedroom as belonging to Defendant. (ECF No. 1-1, at 4, para. 11.)

requirement for any traffic violation, nor for probable cause as to any criminal activity, for an investigatory stop on a vehicle.

Furthermore, "[r]easonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) (quoting *Ornelas v. United States*, 517 F.3d 690, 695 (1996)). In assessing how reviewing courts should make reasonable-suspicion determinations, the Supreme Court has made clear that they "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273; *United States v. Singh*, 363 F.3d 347, 354 (4th Cir. 2004). "Although an officer's reliance on a mere '"hunch"' is insufficient to justify a stop . . ., the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard . . . ." *Arvizu*, 534 U.S. at 274 (citations omitted). Further, to have reasonable suspicion, an officer "need not rule out the possibility of innocent conduct." *Id.* at 277.[4]

Part of the Court's assessment of whether Officers Baird and McIntosh acted reasonably under all the circumstances depends on the nature and source of the information they received about the suspected criminal activity. When an officer conducts a *Terry* stop based on information provided by a third party, the information must "exhibit[] sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Alabama v. White*,

---

[4]     Once a vehicle has been lawfully stopped, the length of any subsequent "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Sharpe*, 470 U.S. 675, 684 (1985) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). In other words, the investigating officer may use a reasonable amount of time to investigate the circumstances prompting the stop and possibly develop probable cause to search the vehicle for contraband or arrest the occupants. *See Singh*, 363 F.3d at 357 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)). Here, Defendant makes no challenge to that aspect of the stop, so the government does not address it further at this time.

496 U.S. 325, 327 (1990). While the Supreme Court has noted that anonymous tips, without more, "seldom demonstrate[] the informant's basis of knowledge or veracity," *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *White*, 496 U.S. at 329) (quotation marks), the Fourth Circuit, as well as courts in other Circuits, have afforded face-to-face tips added indicia of reliability and have drawn a clear distinction between purely anonymous tips and tips, such as here, that are provided to police during in-person encounters.

Face-to-face tips—even anonymous ones—are routinely found to be more reliable than, for instance, telephone tips "because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant"—essentially, to appraise the tipster when the tip is provided. *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004) (citing *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000)); s*ee also United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) (noting that "a face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false"). Accordingly, the Fourth Circuit has repeatedly noted the substantial difference between an in-person tip and a tip provided by an anonymous caller. *See, e.g.*, *United States v. Blauvelt*, 638 F.3d 281, 288 (4th Cir. 2011) (finding sufficient probable cause for a search warrant after noting that courts have no difficulty distinguishing between face-to-face and anonymous tips; "'Unlike an anonymous tipster, an informant who meets face-to-face with an officer provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement.'") (quoting *United States v. Perez*, 393 F.3d 457, 462 (4th Cir. 2004)); *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009) (summarizing such factors as that a tip was provided in public and proximity to the alleged criminal activity as

supporting reasonable suspicion); *United States v. Christmas*, 222 F.3d 141, 144-45 (4th Cir. 2000) (describing various factors in favor of the credibility of an in-person tip from even an unnamed informant, but who provided her home address at the time of the tip, as sufficient to establish reasonable suspicion).

As such, contrary to Defendant's contention that Officers Baird and McIntosh "had nothing more than an inchoate and unparticularized suspicion or hunch of criminality," (ECF No. 22, at 4), the officers used their law enforcement skills, experience, and common sense as the impetus to conduct an investigatory stop on the black Toyota Tundra. Officers Baird and McIntosh were flagged down by Individual 1, who advised that he had been involved in a road rage incident in which two male occupants of a black Toyota Tundra threatened to shoot him on Farmingdale Avenue just moments before. (*See* ECF No. 1-1, at 3, para. 5; *see, e.g.*, Ex. A, at 1; Ex. B; Ex. C.) Proceeding in that direction, the officers quickly observed a black Toyota Tundra coming towards them on Farmingdale Avenue—both the vehicle and with two occupants matching Individual 1's description—basically as soon as they started in the direction Individual 1 had indicated. (*See* ECF No. 1-1, at 3, para. 6; ECF No. 19-1, at 11.) That corroborated the initial information, and the officers properly proceeded with an investigatory stop.

In light of the officers' experience and common sense, they could make a reasonable inference that the black Toyota Tundra they encountered on Farmingdale Avenue coming towards them from where Individual 1 had just fled was the black Toyota Tundra whose occupants' threatening conduct on Farmingdale Avenue had just been reported to them, at least for purposes of inquiring further. *Arvizu*, 534 U.S. at 266. Following the Supreme Court, the Fourth Circuit has similarly emphasized the importance of giving "'due weight' to the factual inferences drawn by police officers as they investigate crime . . ., for the reasonable suspicion

analysis is by its nature 'officer-centered.'" *United States v. McCoy*, 513 F.3d 405, 411 (4th Cir.

2008) (citation omitted).  To require otherwise would contravene the entire purpose of an

investigative stop, which is to allow officers to "approach a person for purposes of investigating

possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v.

Ohio*, 392 U.S. 1, 22 (1968).  The physical and temporal proximity in which the officers found

the black Toyota Tundra, after receiving the alarming allegation from a face-to-face report,

provided ample basis to inquire through an investigative stop.

Following the lawful stop of the black Toyota Tundra, then, it was only a matter of

moments before Officer McIntosh observed the large, partially-concealed firearm hidden

vertically underneath Defendant's shirt.  (*See* ECF No. 1-1, at 3, para. 7; ECF No. 19-1 at 11.)

Not only did this corroborate the information that the officers had just received about a threat to

shoot someone, but also the plain view doctrine allows police officers to seize objects without a

warrant if:  (1) the officer was lawfully present in the location from which he viewed the item;

(2) the officer had lawful access to the item itself; and (3) the "incriminating character" of the

item is "'immediately apparent.'" *Horton v. California*, 496 U.S. 128, 136 (1990); *United States

v. Davis*, 690 F.3d 226, 233 (4th Cir. 2012); *United States v. Wells*, 98 F.3d 808, 809-10 (4th Cir.

1996); (Ex D).  That concealed firearm on a public road, on an individual soon identified as a

repeated convicted felon, was plainly incriminating, and none of these three criteria is challenged

here.[5]

To discredit the officers' reasonable inferences in this case in favor of Defendant's

conclusory assertion that "[t]here existed no reasonable articulable suspicion of criminal activity

---

[5]       As only a passenger in the vehicle, Defendant would also lack standing to challenge a
search of that vehicle, but because he purports to challenge the stop itself, the government does
not further address this distinction here.

warranting or giving rise to an investigative stop," (ECF No. 22, at 4), would, in a prohibited

manner, "demand scientific certainty from officers under a *Terry* analysis." *United States v.*

*Perkins*, 363 F.3d 317, 322 (4th Cir. 2004) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125

(2000)). To the contrary, this Court's "determination of reasonable suspicion must be based on

commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

*Accord, e.g.*, *United States v. Pettiford*, 295 F. Supp. 2d 552, 558 (D. Md. 2003) (concluding that

an officer's suspicion that a defendant had been involved in a "road rage" shooting was

reasonable and articulable based on such factors as matching individual and vehicle descriptions

and proximity to a reported incident, so as to render the stop of the defendant's vehicle a legal

*Terry* stop for the purpose of allowing the police to investigate the reports of the shooting). In

view of all the circumstances, the commonsense judgments and inferences drawn by Officers

Baird and McIntosh in conducting an investigatory stop here and securing the fruits of that stop

were objectively reasonable. Defendant's motion to suppress should be denied.

Nor does Defendant's reference to the subsequent affidavit, which he represents that a

defense investigator procured from Individual 1, (ECF No. 22, at 4-5), alter the analysis. Indeed,

as he notes, an investigative stop hinges on the information that officers had *at the time of the*

*stop*, and an individual's recantation or contradiction of information provided to law enforcement

on a later occasion does not change the original analysis. As described in detail above, the facts

supporting the investigative stop, of Individual 1 flagging down Officers Baird and McIntosh and

reporting to them that someone in a black Toyota Tundra had threatened to shoot him moments

before, are commemorated both in two contemporaneous signed, sworn statements, and in the

video of those statements being written, right after the report was made (and confirming, too,

what was reported). (Ex. A; Ex. B; Ex. C.) As such, that affidavit does not affect the *Terry* inquiry.

Further, although Defendant does not appear to challenge it separately, the subsequent search of the residence, by way both of the owner's consent and the search warrant mentioned above, also appropriately flowed from the stop, for the reasons described in TFO McGowen's affidavit in support of that search. A search warrant is valid if probable cause existed to support its issuance. *See, e.g.*, Fed. R. Crim. P. 41(a). A judicial officer's probable cause determination is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005) (summarizing this standard).

The standard for reviewing a judicial officer's determination of probable cause is also well-established: the reviewing court "must accord 'great deference' to the [judicial officer's] assessment of the facts presented to him" and "may ask only whether the [judicial officer] had a 'substantial basis . . . for concluding' that probable cause existed." *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (citation omitted); *see also United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004) (similarly summarizing the standard). The task of a reviewing court "is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984); *see also United States v. Chandia*, 514 F.3d 365, 373-74 (4th Cir. 2008). In doing so, the reviewing court should "consider only the information presented to the magistrate who issued the warrant" when reviewing the magistrate's probable cause determination. *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996).

Based on the facts outlined in the affidavit in support of the search warrant here, Defendant does not (and cannot) challenge the satisfaction of this standard.

## B. Collective Knowledge Doctrine

Defendant's reference to the collective knowledge doctrine misapprehends that doctrine, moreover, and similarly does nothing to undermine the stop in this case. (*See* ECF No. 22, at 5-6). Contrary to his assertion, (*id.*), there is no requirement in the law that an officer explicitly refer to the doctrine in order to have it apply—and here, TFO McGowen and Officer Mandujano nonetheless made clear that they were relaying in their affidavits or report circumstances that had affected Officers Baird and McIntosh, rather than themselves, in the first instance.[6]

"Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion[,] but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation. *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (citing *United States v. Hensley*, 469 U.S. 221, 230-33 (1985)). The doctrine "was developed in recognition of the fact that with large police departments and mobile defendants, an arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials." *Id.* Thus, the collective knowledge doctrine permits an officer to stop, search, or arrest a suspect based on information known to another officer or police agency, even if the officer himself does not know

---

[6]     Because neither TFO McGowen nor Officer Mandujano was involved in the investigatory stop of the black Toyota Tundra, the government presumes that Defendant, here, moves to suppress the evidence recovered as a result of the issued search warrant on the Farmingdale Avenue house, or in some manner to challenge his arrest—but any such challenge is unavailing for the reasons summarized herein.

facts that amount to the necessary level of suspicion for the given action.  *See Hensley*, 469 U.S. at 232-33; *United States v. Ventresca*, 380 U.S. 102, 110-12 (1965).  Essentially, when law enforcement agents are working together to accomplish a common goal, whether or not they even work for the same agency, "the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983).  As is well established in this Circuit, therefore, "[w]hen a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest." *United States v. Joy*, 336 F. App'x 337, 342 (4th Cir. 2009) (quoting *United States v. Laughman*, 618 F.2d 1067, 1072 n.3 (4th Cir. 1980)).

Defendant offers no authority—and the government is aware of none—that supports an assertion that the collective knowledge doctrine prevents the inclusion of facts in a search or arrest warrant application that are not personally known to its affiant.  To the contrary, this is commonplace and *strengthened by* the collective knowledge doctrine, and both officers disclosed the basis for their affidavits as coming from Corporal Baird's and Officer McIntosh's experience.  And in any event, here, the investigatory stop of the black Toyota Tundra was made directly by the officers who had the direct knowledge themselves of the reported criminal activity.  (*See* ECF No. 1-1, at 3, para. 6; ECF No. 19-1, at 11.)

Even assuming the collective knowledge doctrine *is* relevant here, it supports the government—not Defendant—because it attributes information held by others to each individual officer who is participating in the investigation.  *See Andreas*, 463 U.S. at 772 n.5; *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011) (characterizing the doctrine as that "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had

sufficient information to justify taking such action herself").  Accordingly, the facts of the initial

stop—later documented as part of official arrest reporting—were subsequently and properly

incorporated into search and arrest warrant applications as part of additional law enforcement

activity.  Indeed, TFO McGowen stated in her affidavit in support of Defendant's federal arrest,

for instance, that "[b]ecause this Affidavit is being submitted for the limited purpose of

establishing probable cause for the issuance of the requested criminal complaint and arrest

warrant, I have not included every detail of every aspect of the investigation," and that the

information she did include was "based upon [her] personal knowledge, [her] review of

documents and other evidence, *and [her] conversations with other law enforcement officers and

other individuals*."  (*See* ECF No. 1-1, at 2, para. 3 (emphasis added).)[7]

### C.  The Officers' Good Faith Reliance on the Search Warrant

Even if this Court finds that TFO McGowen erred in some manner in connection with the

---

[7]     Any challenge that Defendant purports to make to his arrest itself on September 5, 2018,
similarly fails.  In Maryland, "[a] police officer may arrest without a warrant a person who
commits or attempts to commit a felony or misdemeanor in the presence or within the view of
the police officer."  (*See* Md. Crim. Proc. Code, § 2-202(a).)  This rule is consistent with long-
established federal precedent holding that the police "may arrest without warrant one believed by
the officer upon reasonable cause to have been guilty of a felony . . . ."  *Carroll v. United States*,
267 U.S. 132, 156 (1925); *see also United States v. Watson*, 423 U.S. 411, 417 (1976) (holding
that a warrant is not required to make an arrest for a felony if probable cause exists); *Atwater v.
City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an
individual has committed even a very minor criminal offense in his presence, he may, without
violating the Fourth Amendment, arrest the offender."); *Maryland v. Pringle*, 540 U.S. 366, 370
(2003) ("A warrantless arrest of an individual in a public place for a felony, or a misdemeanor
committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is
supported by probable cause.").

     Here, during the investigative stop that followed Individual 1's report, the PGPD officers
were eminently justified in securing the firearms they found, and they quickly also learned that
Defendant was prohibited from possessing firearms.  (*See* ECF No. 1-1, at 5, para. 15; ECF No.
19-1, at 12.)  Thus, Defendant's arrest was based on probable cause because the officers
determined that he had violated Maryland gun laws when he, in the presence and within the view
of PGPD officers, possessed a partially-concealed homemade AR-type pistol and a second
handgun loaded with ammunition.  (*See* ECF No. 1-1, at 5, para. 15; ECF No. 19-1, at 12.)

search warrant affidavit in averring to facts that she had not herself observed to establish probable cause, Defendant is not entitled to suppression (or any other relief) unless the investigators acted in bad faith in relying on Judge Nyce's search warrant in this case—which Defendant cannot show. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court underscored the presumption against suppression in the search warrant context, holding that in "the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. '[Once] the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.'" *Id.* at 921 (citation omitted). *Accord, e.g.*, *United States v. Doyle*, 650 F.3d 460, 467 (4th Cir. 2011) (summarizing this standard). Here, there is no indication whatsoever that any PGPD officers acted in bad faith.

The warrant Judge Nyce signed was not the type of "'bare bones'" affidavit that sometimes warrants suppression. *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996). Rather, the affidavit relayed that despite a significant criminal history from which he was prohibited from possessing firearms or ammunition, Defendant had been arrested for possession of two firearms as a result of an investigatory stop. TFO McGowen outlined her extensive law enforcement training, skills, and expertise—particularly, in relation to firearms offenses—and outlined ample probable cause to believe that additional ammunition would likely be found in the residence. (*See* Ex. E, at 4-5.)

Accordingly, both the investigatory stop and the search warrant were amply supported, and as to the search warrant, Defendant does not give any indication to contradict that PGPD officers relied in good faith on that search warrant during its execution (for a search that was, as

mentioned above, also supported by the homeowner's consent).[8]

## II. DEFENDANT IS NOT ENTITLED TO A *FRANKS* HEARING BECAUSE THE PROFFER OF SUBSEQUENT CONTRADICTED STATEMENTS BY A CIVILIAN WITNESS FAILS TO SATISFY THE APPLICABLE STANDARD.

The burden "of making the necessary showing" for a *Franks* hearing is a "heavy one to bear." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). This heavy burden is grounded on the "presumption of validity with respect to the affidavit supporting" a warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). For that reason, the rule in *Franks* "has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." *Id.* at 167.[9]

Under *Franks* and the Fourth Amendment, a defendant is entitled to a pre-trial hearing to challenge the validity of an affidavit *only if* the defendant makes a substantial preliminary showing that "(1) the warrant affidavit contains a 'deliberate falsehood' or statement made with 'reckless disregard for the truth' and (2) without the allegedly false statement, the warrant affidavit is not sufficient to support a finding of probable cause." *United States v. Fisher*, 711

---

[8]     Supreme Court jurisprudence firmly establishes that police officers may search a jointly occupied premises without a warrant if one of the occupants consents. *See United States v. Matlock*, 415 U.S. 164, 169-72 (1974). The owner of a home has a right to allow others to enter and examine the premises, and "there is no reason why the owner should not be permitted to extend this same privilege to police officers if that is the owner's choice." *Fernandez v. California*, 571 U.S. 292, 298 (2014). Here, following the lawful investigative stop, the driver of the black Tundra— the owner and a fellow resident of the Farmingdale Avenue house—provided consent for law enforcement to search the home. (*See* ECF No. 1-1, at 5, para. 10; ECF No. 19-1, at 13; Ex. E, at 1.) Thus, the search of the Farmingdale Avenue house was proper regardless of the search warrant application, as well.

[9]     Defendant's *Franks* motion only purports explicitly to challenge the truthfulness of "the affidavit (statement of probable cause) in support of the criminal complaint and arrest," (ECF No. 23, at 1), and the government reads this reference to both state-court and the federal charging documents as challenging both the state-court actual statement of probable cause and the federal criminal complaint affidavit. However, to the extent that Defendant also intended to raise a *Franks* objection to the affidavit in support of the search warrant that was ultimately issued for the Farmingdale Avenue house, such an argument would fail for the same reasons described here.

F.3d 460, 468 (4th Cir. 2013) (quoting *Franks*, 438 U.S. at 155-56). Even if a defendant satisfies the substantial preliminary showing requirement, his request for a *Franks* hearing must be denied if there "remains sufficient content in the warrant affidavit to support a finding of probable cause" after the court sets aside the "material that is the subject of the alleged falsity or reckless disregard." *Franks*, 438 U.S. at 171-72.

In support of his motion, Defendant insinuates that officers' statements in the case were false because, and only because, the months-later statement he submits purporting to be from Individual 1 contradicts Individual 1's prior statements about certain details of the incident on September 5, 2018, and that anyone from the Tundra had threatened to shoot him. In light of the contemporaneous recording of the giving of the original sworn statements by Individual 1 and Individual 2, however, and those original sworn statements themselves, Defendant cannot make any possible showing that an officer in this case made a deliberate false statement or a statement with reckless disregard for its truth in any affidavit, as the standard requires. The affidavits were true to the information reported. Indeed, the fact that months after the initial incident on September 5, 2018, and after both state and federal charges, a defense investigator procured a signed statement from Individual 1 in which Individual 1 makes certain statements different from those he provided to law enforcement more than six months before, by way of a document dated March 12, 2019 (the "March 2019 Statement"), does nothing to invalidate any of the previous events in the case.

Ultimately, the Court should view the March 2019 Statement with healthy skepticism. For whatever reason, Individual 1's March 2019 Statement does appear to be at odds with the sworn, handwritten statement he provided on the day in question, as well as Individual 1's videotaped conversation with Officer Stokes and all of the information from Individual 2. Those

contradictions in Individual 1's seeming recantation must be considered by this Court when appraising whether or not Defendant is entitled to a *Franks* hearing, given that the request for the hearing is based entirely upon Individual 1's credibility vis-à-vis that of the police officers involved in this case, and is contradicted in each pertinent respect by his recorded statements to the police on September 5, 2018—upon which law enforcement quite reasonably relied. Importantly, it is the contemporaneous statements that affect the possibility of any misstatement by the officers in this case—and those contemporaneous statements make clear that there was none. Individual 1's perfunctory recantation is the only support Defendant submits for his motion. The Court should decline to weigh one witness's months-later recantation more heavily than that witness's *and another witness's* sworn contemporaneous statements to law enforcement promptly following the incident, especially where those sworn statements are further documented in video footage of the statements being given, right after his initial contact with law enforcement.[10]

---

[10]    For instance, Individual 1's original sworn statement described a road rage incident involving a black Toyota Tundra on Farmingdale Avenue. (*See* Ex. A, at 1-2 (starting with the notation that "We started at Kenilworth he cut me off . . .").) He confirmed the color of the Toyota Tundra as black, to Officer Stokes, verbally, on multiple occasions minutes later—as well as in his sworn written statement, as described above. However, in his March 2019 Statement, he avers that the Toyota Tundra was white, despite having never mentioned any white vehicle in his conversation with Officer Stokes or in his sworn written statement on September 5, 2018. (*Compare* ECF No. 19-1, at 1-2, *with* Ex. A and Ex. C.) Notably, the facts asserted in Individual 1's initial written statement are reinforced by Individual 2's separate, sworn written statement to law enforcement at the same time, which describes a "black pick-up truck." (*Compare* Ex. A and Ex. B.) Furthermore, in the March 2019 Statement, Individual 1 avers that it was not him, but rather Individual 2 who spoke with Officers Baird and McIntosh. (*See* ECF No. 19-1, at 1-2.) This assertion similarly contradicts both individuals' statements on September 5, 2018. (*See, e.g.*, Ex. A, at 1 ("I then turned to see two police officers and told them my statement."); Ex. B, at 1 ("Once we got to the top of the hill there were two officers who [Individual 1] was able to tell what occurred."). Individual 1 told Officer Stokes: "I seen the officers right here, I just waved them down . . . ." (Ex. C at 9:47:22.)

    Further, in his March 2019 Statement, Individual 1 claims that after he followed the pick-up truck to the Farmingdale Avenue house and verbally confronted its driver and passenger, "[t]he two men did not respond to me, the two men just turned and walked into the house," and

"Probable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [he] ha[s] reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (citing *Carroll*, 267 U.S. at 162). And later recantations of statements to police officers does not affect the *Franks* inquiry, which hinges on the officer's conduct at the time of the affidavit. *See United States v. Jackson*, 427 F. App'x 109, 112 (3d Cir. 2011) (reiterating previous Third Circuit case law that "[r]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts") (citation and quotation marks omitted); *United States v. Cruz*, No. 14-70 (YK), 2015 WL 5514816, at *7 n.7 (W.D. Pa. Sept. 17, 2015) ("[R]ecantation of a witness statement made to law enforcement and included in an affidavit of probable cause does not speak to whether probable cause existed at the time of the warrant or to an affiant's knowing or reckless disregard for the truth so long as the recantation occurred *after the affidavit was sworn*.") (emphasis in original); *United States v. Blair*, No. 12-275 (GD), 2013 WL 5593001, at *6 (W.D. Pa. Oct. 10, 2013) (finding that "[a witness's] subsequent decision to recant his statements does not establish that [an affiant] knowingly and intentionally or with reckless disregard for the truth included false information in the affidavit," and noting also that "those assertions do not make the requisite substantial

---

that "[n]either of the two men threatened me or my passenger." (ECF No. 19-1, at 1.) However, moments after the incident occurred on September 5, 2018, Individual 1 told Officer Stokes that he saw the "man running out, like, 'yeah, yeah, what's up? I'll shoot you' . . . ." (Ex. C at 9:34:20.) He later reiterated Defendant's threatening statements to him: "'[Y]eah, why you leaving now? Why you leaving now? I'll shoot you," (*id.* at 9:47:00-9:51:30, 9:51:50), while physically demonstrating to the officer how the driver "hopped out" and began "*running* up the steps" and "into his house," (*id.* at 9:47:10 (emphasis supplied).) Additionally, in his March 2019 Statement, Individual 1 claims "[t]here was no reason for the police to be flagged down in connection with this incident. I was never scared in connection with this incident." (ECF No. 19-1, at 2.) On September 5, 2018, he was visibly agitated and stated, for instance, about giving the written statement that it was fine: "[M]y life was in danger." (Ex. C at 9:36:05.)

preliminary showing necessary to obtain a *Franks* hearing"); *cf. Freeman v. County of Bexar*, 210 F.3d 550, 555 & n.3 (5th Cir. 2000) (holding, in case under 18 U.S.C. § 1983, that absent evidence of coercion in obtaining sworn statements, an officer's reliance on those sworn statements was "undoubtedly reasonable" because the officer "could not have predicted that the witnesses would later recant their testimony and did not have any information suggesting that they were not telling the truth in their sworn statements").

Here, in light of both Individual 1's and Individual 2's accounts of the road-rage incident, both in writing and on video, Defendant cannot show that the PGPD officers lacked reasonable suspicion to conduct an investigative stop upon the black Toyota Tundra in which Defendant was a passenger on September 5, 2018, or undermine any subsequent action in the case. Even if an arrest warrant was necessary to arrest Defendant, and even if this Court were to afford any weight to the March 2019 Statement, Defendant, here, cannot argue that, at the time any affidavit was filed, TFO McGowen or another officer made any false statement at all so as to warrant a hearing under *Franks*. *See United States v. Lum*, 557 F. Supp. 2d 461, 466 (D. Del. 2008) (noting that an affiant "could not have deliberately or recklessly omitted information not within his range of knowledge"). To the contrary, the record shows that there was an adequate factual and good faith basis for the statements made in the affidavit at the time that each affidavit was prepared and submitted to the issuing judge. "'[A] valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time*.'" *United States v. Matthews*, 701 F. App'x 284, 285 (4th Cir. 2017) (citing *United States v. McCall*, 740 F.2d 1331, 1335-36 (4th Cir. 1984)) (emphasis added). Absent the gift of precognition, law enforcement could not have been expected to doubt

Individual 1's and Individual 2's statements or to foresee Individual 1's March 2019 Statement on September 5, 2018.

Notably, too, the ultimate search and arrests do *not* hinge on any details of the road rage incident or, for instance, the color of the Toyota Tundra; instead, the search and arrests in this case were based on Officers Baird and McIntosh having seen Defendant's first weapon in plain view, only partially concealed under his clothing, having found his second weapon loaded in his waistband, and having become aware of his criminal history. Any search of his residence was amply justified. Even if Defendant could meet the substantial burden of *Franks* and the purportedly false statements were excised, therefore, since "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks,* 438 U.S. at 171-72.

Even if Individual 1's account of the road-rage rage incident were ignored, moreover, Individual 2's account still provides an adequate basis for the investigative stop of the black Toyota Tundra that would have resulted in the plain-view discovery of Defendant's firearms and the succeeding events, as well. As previously discussed, moreover, during the investigative stop, Officer McIntosh quickly noticed a large, partially-concealed firearm hidden vertically underneath Defendant's shirt, and subsequent investigation led to the discovery of a loaded .45 caliber handgun in Defendant's waistband and Defendant's ultimate arrest. (*See* ECF No. 1-1, at 3-5; ECF No. 19-1, at 11.) *Those* were the key facts supporting a search, rather than anything to do with the road rage incident at all. TFO McGowen submitted an affidavit in which she set forth her knowledge that, among other things, "[i]ndividuals in possession of firearms[] keep ammunition and magazines in their possession in the event they need to use that weapon," that "[i]ndividuals prohibited from possessing firearms and ammunition typically conceal their

firearms or firearms accessories inside of their home to prevent law enforcement officials from discovering the items," and that ".45 caliber ammunition is not normally sold in quantities of 8 rounds, and that individuals who possess loaded guns possess the packaging for and other rounds of ammunition in their residences or storage dwellings . . . ." (Ex. E at 4-5.) Nothing in the March 2019 Statement undermines any of these facts. Accordingly, Defendant does not point to any statement that, if excised, would defeat that existence of probable cause.

In sum, the affidavits in this case were supported by sufficient probable cause, and Defendant does not approach making an appropriate showing so as to justify a *Franks* hearing. Defendant's motion for such a hearing should be denied.

## CONCLUSION

Based on the foregoing, the Government respectfully requests that this Court deny Defendant's Pretrial Motions.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:   /s/_____
Elizabeth G. Wright
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will provide notice of such filing to all participants in the case. I am also causing a copy to be mailed via First Class mail, postage pre-paid, to:

Burudi Jarade Faison
USMS # 35075037
Central Detention Facility
1901 D Street, SE
Washington, DC 20003

/s/_____
Elizabeth G. Wright
Assistant United States Attorney