**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | * | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Case No.: GJH-19-27** |
| **BURUDI FAISON,** | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

As we neared the prison, I saw its razor-wire fences, towers, and lights. Otherwise the low modern buildings looked more like a business park than a federal prison. Green land surrounded it. Our bus pulled up to the gate. Again we faced a reception line of guards with shotguns and automatic assault rifles.

…

The twenty of us marched in, handcuffed and shackled.

…

The guards marched us to a crowded common cell with a stinking, unscreened toilet in the middle.

…

The doors closed behind us. We were taken to small holding cells where we slept on concrete slabs and waited until guards pulled us out one by one for cursory medical exams and fingerprinting. We were each issued a hunter orange jumpsuit and a pillowcase containing a toothbrush, toothpaste, and bar of three-cent soap that, according to a couple of guys with me, would dry out your skin and leave you scratching for a week.

…

One at a time we were taken from the cell, fingerprinted, strip-searched, asked to raise our genitals and spread our cheeks, allowed a one-minute shower, and tossed into smaller cells.

…

Prison is danger in a box, but it is also, at bottom, a grinding routine of boredom. You wouldn't think those two things go together, but they do. The most dangerous moments often come because someone is so bored they finally have to start trouble just to break the torture of monotony.

1

SHON HOPWOOD, LAW MAN: MY STORY OF ROBBING BANKS, WINNING SUPREME COURT CASES, AND FINDING REDEMPTION 12–13, 14, 15, 69 (2012).

The sentencing of defendants in federal court is such a common occurrence that it is important to occasionally pause and remember what is at stake. A human life, designed both by nature and our nation's Constitution to live free and pursue happiness, is taken away from family and familiar surroundings to serve days, months, years, or a lifetime in a prison cell. Whether it is the newly incarcerated individual's first experience with incarceration or just the most recent, he must quickly adapt to the stunning loss of freedom and privacy while struggling to maintain any sense of his personal dignity.

During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.

In that vein, Congress has identified the factors courts must consider at sentencing in 18 U.S.C. § 3553(a), which includes the oft repeated admonition that the court should "impose a

sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. And judges strive mightily to use their considerable power with great care and in concert with § 3553(a). More specific guidance is provided to judges in the form of the United States Sentencing Commission Guidelines Manual. The Manual's stated purpose is to create an "effective, fair sentencing system." U.S. SENTENCING GUIDELINES MANUAL 3 (U.S. SENTENCING COMM'N 2018). And any novice criminal practitioner can explain in broad strokes how the Sentencing Guidelines operate in an attempt to accomplish this task: base offense levels are set for a variety of offenses and then aggravating factors lead to higher sentences while mitigating factors lead to lower sentences.

But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for. This is, in part, because in the context of a particular crime, a seemingly sensible guideline sometimes ceases to serve what should be its primary purpose: making distinctions between defendants based on culpability.

With that, the Court turns to the specific example of Burudi Faison. At trial, Mr. Faison was convicted of Possession of Firearms and Ammunition by a person convicted of a crime punishable by a term of imprisonment exceeding a year ("Felon in Possession") and acquitted of a second count charging him with Possession of Ammunition by a person convicted of a crime punishable by a term of imprisonment exceeding a year. In short, the facts at trial established that Mr. Faison, and his father who was driving, had been involved in a road-rage confrontation, after which Mr. Faison rode back to his home, retrieved two firearms and was soon thereafter pulled over by police who discovered the firearms. Jails calls introduced into evidence suggested that he instructed his father to drive them home for the purpose of finding the guns and pursuing his

newfound adversaries. At trial, Mr. Faison asserted a justification defense, whereby he claimed that, in fear for his safety, he had gone into a shed on his family's property looking for any weapon he could find and happened upon the firearms, which he felt he had no choice but to possess in order to defend himself against approaching assailants.[1] He took the stand and testified consistent with this defense. Mr. Faison's father also took the stand to generally support his son's version of events.

The jury did not credit Mr. Faison's version of events, as reflected by its guilty verdict.

In the Pre-Sentence Report ("PSR"), Probation determined that Mr. Faison's base offense level was 22 because the offense involved the possession of a semiautomatic firearm capable of accepting a large capacity magazine and Mr. Faison had a prior conviction for a controlled drug offense, specifically a conviction in the United States District Court for the Eastern District of New York for Attempt to Possess with Intent to Distribute 500 Grams or More of Cocaine. The PSR also indicated that a two-level enhancement was appropriate because the firearm was stolen. While the defense did not dispute that the gun was stolen, the Government provided no evidence that Mr. Faison stole the gun or knew that the gun had been stolen. Mr. Faison was also assessed a four-level enhancement for possessing the firearm in connection with another felony. The Government suggested two theories for this enhancement: first, he possessed the gun with the intent to commit, at least, First Degree Assault, and second, that ammunition found in his room, for which he was acquitted, was in furtherance of drug trafficking, for which he was not charged. Finally, because both Mr. Faison and his father testified, the PSR assessed an additional two-level enhancement for obstruction of justice.

---

[1] It should be noted that the evidence did not establish, nor did the Government argue, that Mr. Faison and his father were the initial aggressors in the road-rage confrontation. Indeed, it appears the other car intentionally followed Mr. Faison and his father for some period.

The defense challenged the Stolen Gun, Possession in Connection with a Felony, and Obstruction of Justice enhancements and contended that Mr. Faison's prior conviction for Attempt to Possess with Intent to Distribute did not qualify as a controlled drug offense for guideline purposes. If the Court were to rule in favor of Mr. Faison on each contested issue, his offense level would be 20. With a criminal history category of IV, his advisory guideline range would be 51–63 months of incarceration. Accepting all arguments from the Government and the recommendations of the PSR, Mr. Faison's offense level would be 30 with a resulting advisory guideline range of 135–168 months. Even after reducing the sentence to 120 months, which is the statutory maximum for the crime of conviction, the decision to apply or not apply certain enhancements could potentially double Mr. Faison's advisory guideline range.

I.  DISCUSSION

As is true here, the Guidelines are often not complicated to apply. And the Court recognizes that many of the questions it grapples with here have been resolved as matters of constitutional law. Nonetheless, courts have been given some discretion in how the Guidelines are applied, leaving room for policy disagreements and, because they are advisory, varying from the Guidelines where warranted. *See United States v. Booker*, 543 U.S. 220, 246 (2005) (adopting an approach to sentencing that "make[s] the Guidelines system advisory while maintaining a strong connection between the sentence imposed and the offender's real conduct").

Regarding policy disagreements, in *Kimbrough v. United States*, 552 U.S. 85 (2007), the Supreme Court considered the Guidelines' disparate treatment of crack and powder cocaine offenses and held that a sentencing judge has discretion to depart from the Guidelines based on that judge's conclusion that this disparity yields sentences that are "'greater than necessary' to serve the objectives in sentencing." 552 U.S. at 91. Several circuits, including the Fourth Circuit,

have interpreted *Kimbrough* to allow sentencing courts to vary from the Guidelines based on categorical, policy-based disagreements even outside of the crack cocaine context. *See United States v. Morace*, 594 F.3d 340, 349–50 (4th Cir. 2010); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) (stating that "district courts may 'vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines'" (quoting *Kimbrough*, 552 U.S. at 101)); *United States v. Lychok*, 578 F.3d 214, 219–20 (3d Cir. 2009); *United States v. Aguilar-Huerta*, 576 F.3d 365, 367 (7th Cir. 2009) ("A sentencing judge is free, as we said, to reject a guideline as inconsistent with his own penal theories; and rejecting a guideline as lacking a basis in data, experience, or expertise would thus be proper."); *United States v. Herrera-Zuniga*, 571 F.3d 568, 584 (6th Cir. 2009); *United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009); *United States v. Cavera*, 550 F.3d 180, 194, 196–97 (2d Cir. 2008); *United States v. Tankersley*, 537 F.3d 1100, 1112–13 (9th Cir. 2008); *see also Peugh v. United States*, 569 U.S. 530, 536–37 (2013) (stating that "[t]he district court may not presume that the Guidelines range is reasonable; and it may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views" (internal quotation marks and citations omitted)).

Thus, at least as to the Obstruction of Justice and Stolen Gun enhancements, the Court does not seek to disturb settled precedent establishing that these enhancements *may* be applied by the Court in this case, but instead explains why it will decline to apply them here.

**A. Obstruction of Justice Enhancement (§ 3C1.1)**

Because Mr. Faison and his father testified at trial, and their testimony was inconsistent with evidence of guilt accepted by the jury, the Government sought a two-level enhancement

under § 3C1.1 of the Sentencing Guidelines for obstructing or impeding the administration of justice. ECF No. 104 at 29. That guideline provides that:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. Application Note 4 of the guideline provides a "non-exhaustive list of examples of the types of conduct to which [the] adjustment applies," including "committing, suborning, or attempting to suborn perjury," "providing materially false information to a judge," and "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." *Id.* cmt. nn.4(B), 4(F), 4(H).

The Government maintains that Mr. Faison perjured himself when he testified at trial and suborned the perjury of his father to support his false account. Specifically, the Government asserts that Mr. Faison actively attempted to mislead the jury about his knowledge and actions during the road-rage incident that led to his arrest and indictment. ECF No. 104 at 30. It is clear from their verdict that the jury believed Mr. Faison was untruthful when he testified that he did not know the firearms he took from his home were there and that, upon discovering them, he asked his father to drive him to a police station in order to surrender them.

The Court will nonetheless decline to increase Mr. Faison's base offense level under the § 3C1.1 Obstruction of Justice guideline. In short, the Court has profound and fundamental concerns about applying the Obstruction of Justice enhancement when defendants testify to an account of events that the jury ultimately disbelieves. Although the Court is well aware that the Supreme Court has found this practice constitutional, *see United States v. Dunnigan*, 507 U.S. 87, 96–98 (1993), the Court respectfully submits that it is unwise. The Court struggles to see

how it serves the purposes of sentencing to increase a defendant's sentence because, as part of his right to a trial, a defendant chooses to testify to a set of facts consistent with what he has already authorized his attorney to argue to the jury.

The Court's concerns on this issue are by no means novel and have been articulated by courts and commentators for more than half a century. In 1969, then-Chief Judge of the District of Columbia Circuit David Bazelon challenged the proposition that defendants have a right to testify but "no constitutional right to lie":

> The beguiling simplicity of this proposition misphrases the question. Of course a defendant has no constitutional right to lie, however much we may sympathize with his too human temptation. But the defendant does have a right to testify in his own defense. In doing so, he risks the jury's disbelief. If he in fact fails to convince the jurors, conviction and punishment will follow. If the Government for whatever reason concludes that prosecution for perjury is appropriate, he risks punishment for that as well. To allow the trial judge to impose still further punishment because he too disbelieves the defendant would needlessly discourage the accused from testifying in his own behalf.

*Scott v. United States*, 419 F.2d 264, 269 (D.C. Cir. 1969). Though the decision was abrogated by the Supreme Court's opinion in *United States v. Grayson*, 438 U.S. 41 (1978), the practical observations that Judge Bazelon made have no less force or accuracy today.

In *United States v. Dunnigan*, the Fourth Circuit articulated the same fundamental concerns, though the court's conclusion that they render § 3C1.1 unconstitutional was overturned. 944 F.2d 178, 183–85 (4th Cir. 1991), *rev'd*, 507 U.S. 87, 96–98 (1993). The court first made clear, as this Court again seeks to underscore today, that "[w]e of course have no desire to condone or encourage perjury." *Id.* at 183. But the court at the same time correctly "fear[ed] that this enhancement will become the commonplace punishment for a convicted defendant who has had the audacity to deny the charges against him." *Id.* "Nearly all testifying

defendants tell a story that, if believed in full, would result in acquittal. The jury's verdict implies a disbelief of some material aspect of the defendant's testimony." *Id.*

The court continued:

> It disturbs us that testimony by an accused in his own defense, so basic to justice, is deemed to "obstruct" justice unless the accused convinces the jury. The facile logic of hindsight deems such disbelieved testimony a lie; inasmuch as there is no right to lie, there is no harm in sanctioning it. Hindsight, however, does not help the accused when he must decide whether to take the stand. He already knows that he faces the possibility of conviction, and that he is much less likely to be acquitted if he remains silent, despite his right to do so and even in the face of instructions to the jury to draw no adverse inference from his silence.

*Id.* Announcing its holding, the court concluded that "[t]he rigidity of the guidelines makes the § 3C1.1 enhancement for a disbelieved denial of guilt under oath an intolerable burden upon the defendant's right to testify in his own behalf." *Id.*

Judge Bazelon in *Scott* also addressed the absurd notion that a defendant who testifies at trial is somehow less redeemable than a defendant who exercises his right to remain silent, the latter of whom is most often motivated by a fear of facing cross-examination by a skilled federal prosecutor and not an increased sense of moral consciousness:

> [T]he peculiar pressures placed upon a defendant threatened with jail and the stigma of conviction make his willingness to deny the crime an unpromising test of his prospects for rehabilitation if guilty. It is indeed unlikely that many men who commit serious offenses would balk on principle from lying in their own defense. The guilty man may quite sincerely repent his crime but yet, driven by the urge to remain free, may protest his innocence in a court of law.

*Id.* In short, the purpose of sentencing enhancements – distinguishing more culpable defendants and punishing them accordingly – is not at all furthered by enhancing the sentence of a defendant who chooses to tell his story directly to a jury rather than through counsel's argument.

9

Finally, classifying a defendant's rejected testimony as obstruction of justice disregards the plain reality that the essence of a trial is the resolution of the tension between two conflicting stories. This is true in civil as well as in criminal trials, yet only the criminal defendant faces the risk of additional incarceration based on findings by a judge when his story is rejected. The history of a defendant's right to testify further illustrates the point. At common law, as the Supreme Court explained in *Rock v. Arkansas*, 483 U.S. 44 (1987), "all parties to litigation, including criminal defendants, were disqualified from testifying because of their interest in the outcome of the trial." 483 U.S. at 49. "The principal rationale for this rule was the possible untrustworthiness of a party's testimony," a concept that gradually eroded. *Id.* Over time, however, "it came to be recognized that permitting a defendant to testify advances both the 'detection of guilt' and 'the protection of innocence.'" *Id.* at 50 (quoting *Ferguson v. Georgia*, 365 U.S. 570, 581 (1961)); *see also Herring v. New York*, 422 U.S. 853, 862 (1975) ("The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free."). Eventually, "the considered consensus of the English-speaking world came to be that there was no rational justification for prohibiting the sworn testimony of the accused, who above all others may be in a position to meet the prosecution's case." *Rock*, 483 U.S. at 50 (quoting *Ferguson*, 365 U.S. at 582). The Court accordingly determined that the right to testify on one's own behalf at a criminal trial is "essential to due process of law in a fair adversary process." *Id.* at 51 (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)).

Thus, history shows that it has always been understood that a party interested in a case's outcome has a motivation to be less than a fully forthcoming witness. Indeed, that accepted wisdom is part of the Court's standard jury instructions. 1 Leonard B. Sand et al., MODERN

FEDERAL JURY INSTRUCTIONS—CRIMINAL 7-3 (2019) ("Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care."). As discussed in *Rock*, it was so clear at one point that parties were barred from taking the stand. The practice of allowing criminal defendants to testify did not eventually emerge because defendants at some point were expected to be more truthful. Rather, it became clear that pitting the parties' dueling accounts directly against each other before the finder of fact was the most effective means both of reaching the truth and of protecting the sacrosanct and constitutionally protected right to defend oneself at trial. *Rock*, at 483 U.S. at 51; *see Grayson*, 438 U.S. at 56 (Stewart, J., dissenting) (arguing that an enhanced sentence for testifying falsely at trial "is nothing more or less than a penalty imposed on the defendant's exercise of his constitutional and statutory rights to plead not guilty and to testify in his own behalf.").

Ultimately, the remedy for concerns with untruthful testimony is the crucible of cross-examination, not the dangling of increased incarceration based on findings by a sentencing judge.[2] This is true for a criminal defendant, just as with any other party or witness. Thus, the Court will exercise its discretion and decline to impose the Obstruction of Justice enhancement under § 3C1.1.[3]

---

[2] Needless to say, prosecutors retain the power to bring perjury charges, which must be proved at a separate trial before a jury, where they deem it appropriate.

[3] The Court is aware of post-*Booker* rulings in some circuits that application of the enhancement is mandatory whenever a district court finds that the defendant intentionally provided materially false testimony under oath. *See, e.g.*, *United States v. Lindsay*, 931 F.3d 852, 869–70 (9th Cir. 2019); *United States v. DiAmbrosio*, 251 F. App'x 759, 761–62 (3d Cir. 2007). But the Court is not aware of any precedential ruling on this issue from the Fourth Circuit, which has recognized district courts' discretion in factfinding with respect to the obstruction enhancement. *See United States v. Andrews*, 808 F.3d 964, 969 (4th Cir. 2015).

### B. Stolen Gun Enhancement (§ 2K2.1)

The Government also seeks a two-level enhancement because one of the firearms possessed by Mr. Faison was stolen. ECF No. 104 at 13. The Government acknowledges that Mr. Faison did not steal the firearm and there is no basis to even believe he knew it was stolen.

Section 2K.2.1(b)(4)(A) of the Sentencing Guidelines provides for a two-level enhancement where the defendant uses a stolen firearm. U.S.S.G. § 2K2.1(a)(4)(A). This enhancement "applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen[.]" *Id.* § 2K2.1 cmt. n.8(B).

At least one district court has questioned the enhancement's lack of a scienter requirement. In *United States v. Handy*, the court held the enhancement without a scienter requirement to be invalid and unconstitutional. 570 F. Supp. 2d 437, 480 (E.D.N.Y. 2008). The court reasoned that the lack of a scienter requirement was contrary to a closely related statute, 18 U.S.C. § 922(j), which requires the government to prove beyond a reasonable doubt that the defendant knew or had reason to know that the firearm was stolen in order to convict a defendant of possession of a stolen firearm. *Id.* at 478. It stated that "[i]t is difficult to see deterrence value in punishing aggravating circumstances of which a defendant was not aware since he could not have corrected his conduct in deference to the particular criminal law." *Id.* It also cited to research demonstrating that firearms dealers often misreport firearms as lost or stolen in order to avoid liability for selling them to ineligible buyers, and thus just because a firearm is traced as stolen does not prove that it was actually stolen. *Id.* at 478–80.[4]

Regardless of the *Handy* court's criticisms, the lack of a scienter requirement has been constitutionally approved. Indeed, although the Supreme Court has yet to consider the question,

---

[4] The government did not appeal the sentence in *Handy*, so the Second Circuit never had the opportunity to consider the court's conclusion that the lack of a scienter requirement was unconstitutional.

every circuit to consider a challenge to the Stolen Gun enhancement where the defendant had no knowledge that the firearm was stolen has upheld it. *See United States v. Gonzalez*, 857 F.3d 46, 54–56 (1st Cir. 2017); *United States v. Taylor*, 659 F.3d 339, 343–44 (4th Cir. 2011) (finding that the Stolen Gun enhancement is not "inconsistent with federal law" where defendant lacks knowledge that the firearm is stolen); *United States v. Thomas*, 628 F.3d 64, 68–70 (2d Cir. 2010); *United States v. Martinez*, 339 F.3d 759, 761–62 (8th Cir. 2003); *United States v. Murphy*, 96 F.3d 846, 849 (6th Cir. 1996); *United States v. Richardson*, 8 F.3d 769, 770 (11th Cir. 1993); *United States v. Goodell*, 990 F.2d 497, 499 (9th Cir. 1993); *United States v. Schnell*, 982 F.2d 216, 220–22 (7th Cir. 1992); *United States v. Mobley*, 956 F.2d 450, 454–59 (3d Cir. 1992); *United States v. Singleton*, 946 F.2d 23, 26–27 (5th Cir. 1991). Thus, where the defendant's offense involved a stolen firearm, the two-level Stolen Gun enhancement applies regardless of the defendant's knowledge.

Nonetheless, the Court declines to apply this enhancement because no purpose is served by applying it under the facts of this case. If any defendant is convicted of being a felon in possession of a firearm, there is no legal avenue by which that person could have purchased a firearm. Conviction under this particular provision punishes the defendant for having a firearm when he was prohibited by law from doing so. Thus, every felon in possession of a firearm has engaged in the illegal marketplace to acquire a gun. That is true whether the gun reached him through a straw purchase, an illegal transfer from a lawful owner, or by the acquisition of a stolen gun. The felon who acquires a firearm in the illegal marketplace likely does not ask where the gun came from, and if that is in fact part of the typical dialogue when felons purchase firearms, there is no evidence here that Mr. Faison had such a conversation with whomever supplied his firearm. The post-arrest discovery by a federal agent tracing the gun that,

13

unbeknownst to Mr. Faison, the gun was stolen does not reflect on the need to protect the public from the defendant, the need for deterrence, or the seriousness of the offense, nor does it bare on the defendant's history and characteristics or relate to any other relevant sentencing factor. As to Mr. Faison, it is purely a function of chance that the gun was stolen and did not enter the illegal marketplace through a means that does not trigger an enhanced penalty. An outcome based on chance is an inappropriate basis upon which to increase the amount of time that Mr. Faison must spend in federal prison.

### C. Prior Conviction for Controlled Substance Offense (§ 2K2.1)

The next issue of dispute involves whether Mr. Faison's prior federal conviction for Attempt to Possess with Intent to Distribute is a controlled substance offense for purposes of § 2K2.1(a)(3) of the Sentencing Guidelines. That guideline raises the base offense level of a defendant to 22 "if (A) the offense involved a (i) semiautomatic firearm that is capable of accepting a large capacity magazine . . . and (B) the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(3). The Sentencing Commission's commentary to that provision directs that "controlled substance offense" "has the meaning given that term in § 4B1.2(b) and Application Note 1 of the Commentary to § 4B1.2 (Definitions of Terms Used in Section 4B1.1)." *Id.* § 2K2.1 cmt. n.1. § 4B1.2(b) provides that

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

14

U.S.S.G. § 4B1.2(a). Application Note 1 of that guideline further states that "'controlled substance offense' include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offense[]." *Id.* cmt. n.1.

Mr. Faison was previously convicted of a federal drug offense in the Eastern District of New York, the judgment and commitment order for which was entered on February 4, 2011. ECF No. 112-2. The order states that Mr. Faison was found guilty on two counts: "conspiracy to possess with intent to distribute 500 grams or more of cocaine," and "attempt to possess with intent to distribute 500 grams or more of cocaine." *Id.* at 1. The list of statutes cited for each offense is the same: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(ii)(II), and 851(a)(1). *Id.*

The Government argues that *United States v. Dozier*, 848 F.3d 180 (4th Cir. 2017), is binding on this Court. ECF No. 104 at 17–18. The Fourth Circuit there affirmed a defendant's sentence for distributing cocaine in violation of 21 U.S.C. § 841(a)(1). 848 F.3d at 181. The defendant's base offense level was elevated under § 4B1.1 of the Sentencing Guidelines, which applies if "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). Like § 2K2.1(a), that provision utilizes the definition of controlled substance offense provided by § 4B1.2(b). *Id.* cmt. n.1. One of the defendant's prior convictions was a state law conviction for attempt to distribute a controlled substance, which the defendant argued did not constitute a controlled substance offense for purposes of the enhancement. 848 F.3d at 182–83.

According to the Government, the Fourth Circuit conclusively found that the defendant's prior attempt conviction qualified as a controlled substance offense under the commentary to § 4B1.2. ECF No. 104 at 17–19. However, while the Court there found that "[a] controlled substance offense also includes the offenses of 'aiding and abetting, conspiring, and attempting

15

to commit such offenses,'" 848 F.3d at 183 (quoting U.S.S.G. § 4B1.2 cmt. n.1), the Court explicitly stated that it was not addressing the argument Mr. Faison makes here that "the commentary is inconsistent with § 4B1.2." *Id.* at 183 n.2. The court in *Dozier* plainly premised its analysis on the unchallenged assumption that Application Note 1 to § 4B1.2 validly interpreted that guideline; it did not so hold. As the Fourth Circuit has explained, courts are "bound by holdings, not unwritten assumptions." *Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 630–31 (1993)).

Of the courts that have addressed this issue directly, the Court finds persuasive the holdings of the D.C. Circuit in *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018), and the Sixth Circuit in *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc). In *Winstead*, the defendant was charged and convicted of firearm and drug offenses. 890 F.3d at 1083. At sentencing, the District Court found that the defendant's three prior convictions, two of which were for attempted distribution or attempted possession with intent to distribute controlled substances, rendered him a career offender under § 4B1.1(a). *Id.* at 1085, 1087, 1089.

The D.C. Circuit reversed, holding that Application Note 1 of § 4B1.2, as incorporated into § 4B1.1(a) by that guideline's Application Note 1, invalidly added inchoate crimes to the definition of "controlled substance offense." The Court found that § 4B1.2 "presents a very detailed 'definition' of controlled substance offense that clearly excludes inchoate offenses." *Id.* at 1091. The Court also noted that the Sentencing Commission "knows how to include attempted offenses when it intends to do so," pointing to the definition of "crime of violence" in § 4B1.2(a) as a crime that "has as an element the use, attempted use, or threatened use of physical force against the person of another." *Id.* (quoting U.S.S.G. § 4B1.2(a)(1)). For these reasons, the court found that Application Note 1 of § 4B1.2 exceeded the Sentencing Commission's authority and

16

that the defendant's attempt convictions were not properly considered under § 4B1.1(a). *Id.* at 1091–92. The *en banc* Sixth Circuit in *Havis* applied largely the same reasoning, concluding that "the Commission used Application Note 1 to add an offense not listed in the guideline." 927 F.3d at 386. Because the Commission lacked such authority, the court concluded that the defendant's prior state law conviction for an offense including attempted delivery of a controlled substance was not properly considered as a controlled substance offense under § 2K2.1(a). *Id.* at 387.

The Court adopts the reasoning of *Winstead* and *Havis*. As the Supreme Court has explained, "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993); *see United States v. Allen*, 909 F.3d 671, 674 (4th Cir. 2018) (discussing *Stinson*). In short, commentary can explain a guideline, but it cannot change it. For the reasons articulated by the D.C. and Sixth Circuits, Application Note 1's expansion of the definition of controlled substance offense to include attempt is inconsistent with the text of § 4B1.2 and past convictions for attempted controlled substance offenses may not be considered as controlled substances offenses under § 4B1.1 or § 2K2.1(a).[5] *See United States v. Bond*, No. 3:18-00210, 2019 WL 5957203, at *1–*3 (S.D. W.Va. Nov. 12, 2019) (reaching the same conclusions about Application Note 1, the lack of a holding in *Dozier*, and the persuasiveness of *Winstead* and *Havis*).

Nor does the Court credit the Government's additional argument that § 4B1.2(b) itself, independent of the commentary, reaches attempt, especially as it relates to this particular

---

[5] The Court is aware of the Fourth Circuit's statement in *United States v. Mobley* that "Application Note 1 of the commentary to § 4B1.2 is neither inconsistent with nor an erroneous reading of § 4B1.2(a), and is therefore authoritative and binding." 687 F.3d 625, 629 n.5 (4th Cir. 2012). However, neither that case, nor either of the cases that it cites for this proposition, considered the precise issue raised here: the validity of the Application Note's definition of controlled substance offense. *See United States v. Peterson*, 629 F.3d 432 (4th Cir. 2011); *United States v. Hood*, 628 F.3d 669 (4th Cir. 2010). Accordingly, *Mobley* and the cases it relies on do not control the Court's decision here.

instance. ECF No. 112 at 8–10. As stated above, the definition of controlled substance offense includes "an offense under federal or state law . . . that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(a). Clearly, 21 U.S.C. § 841(a)(1) is such an offense. But, under federal law, attempt is a separate offense.

21 U.S.C. § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Thus, § 846 prohibits the attempt to undertake the acts listed in § 841 but not the acts themselves. Having reviewed the indictment and order of judgment and commitment in Mr. Faison's case in the Eastern District of New York, and considered them alongside the text of these statutes, the Court finds that Mr. Faison was convicted under § 846 for his attempt to perform conduct prohibited by § 841(a)(1), and not for a lesser included offense of attempt barred by § 841(a)(1) itself.[6] Thus, Mr. Faison was not previously convicted of a controlled substance offense.

## II.     CONCLUSION

Because Mr. Faison's offense involved possession of a semiautomatic firearm capable of accepting a large capacity magazine, the base offense level is 20.

The Court finds that Mr. Faison had the intent to use the firearm to commit the additional felony offense of, at least, Assault in the First Degree, MD. CODE ANN., CRIM. LAW. § 3-202.[7] Thus, the offense level is increased by 4 levels to 24.

---

[6] Reading the attempt conviction as a lesser included offense of § 841 would render the separate attempt statute superfluous.

[7] The Court makes this finding based, in part, on the jail calls in which Defendant says, *inter alia*, "I was getting ready to go kill him."

Because Mr. Faison's Criminal History Category is IV, his advisory guideline range is 77–96 months.

For the reasons stated in open court, the Court finds that the sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing is 77 months incarceration.

A separate Order shall issue.

Date: February    18, 2020                           /s/
                                                     GEORGE J. HAZEL
                                                     United States District Judge